IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LIFTON ROBINSON, JR,

        Petitioner,

v.                                       CASE NO. 5:10-cv-193-RS-GRJ

SECRETARY, DEPT. OF
CORRECTIONS,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner initiated this case by filing, through counsel, a Petition for a Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2254 and a memorandum of law.  Doc. 1.  The

Respondent filed a response and an appendix with relevant portions of the state-court

record (hereafter "Exh.").  Docs. 29, 30.  Petitioner filed a reply and was granted leave

to expand the record.  Docs. 35, 36, 37.  Upon due consideration of the Petition, the

Response, the Reply, and the state-court record, as expanded, the undersigned

recommends that the Petition be denied.[1]

## Summary of State Court Proceedings

Petitioner was convicted by a Washington County jury of the first-degree

premeditated murder of Latricia "Kizzy" Laster. Exh. A.  The State's theory of the case

was that Petitioner strangled the victim, a girlfriend with whom he had a contentious

relationship, to prevent her from implicating him in a robbery.   It was undisputed that

---

[1] Because the Court may resolve the Petition on the basis of the record, the
Court has determined that an evidentiary hearing is not warranted.  *See* Rule 8, Rules
Governing Habeas Corpus Petitions Under Section 2254.

Petitioner, his friend Julian Williams, and the victim engaged in sex prior to the murder. Following the murder, Williams helped Petitioner move and conceal the body. Another friend, Delathin Campbell, helped Petitioner move the body from the original site. Williams and Campbell both testified against Petitioner under cooperation agreements. In addition to this testimony, a key piece of the State's evidence was an audiotape of a conversation between Petitioner and Williams recorded by Williams and his attorney, Roy Lake, after Williams agreed to cooperate in the murder investigation. On the tape, which was recorded without Petitioner's knowledge, Petitioner implicated himself in the murder. Lake also testified regarding Petitioner's statements to Williams, which Lake overheard. The defense theory was that Williams murdered Laster during a sexual encounter after the group encounter, and then Petitioner participated in moving and hiding her body. *See* Exh. I (trial transcript).

Following the conviction, and pursuant to an agreement with Petitioner, the State declined to seek the death penalty. Petitioner was sentenced to life in prison. Exh. N, O. The First DCA affirmed *per curiam* without a written decision. Exh. R; *see Robinson v. State*, 793 So. 2d 937 (Fla. 1st DCA 2001) (table).

Petitioner sought postconviction relief pursuant to Fla. R. Crim. P. 3.850, asserting numerous claims of ineffective assistance of counsel and one claim of newly discovered evidence. The trial court summarily denied relief on some grounds and conducted an evidentiary hearing on the remaining claims. Exh. Z. Following the evidentiary hearing, the trial court denied the remaining claims. Exh. CC. The First DCA affirmed *per curiam* without a written decision. Exh. FF; *see Robinson v. State*, 32 So.3d 626 (Fla. 1st DCA 2010) (table).

Petitioner also filed a state petition for a writ of habeas corpus alleging ineffective assistance of appellate counsel.  Exh. JJ.  The First DCA denied the petition.  Exh. KK.

Petitioner then filed the instant petition, which Respondent concedes is timely. Petitioner asserts 10 claims of ineffective assistance of trial counsel, one claim that the postconviction court erred in denying relief on a newly-discovered evidence claim, and one claim that the trial court erred in denying his motion for judgment of acquittal. Docs. 1, 2.

## Section 2254 Standard of Review

Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Under § 2254(e)(1), the petitioner must advance clear and convincing evidence that the state court's factual determination was "objectively unreasonable" to rebut the presumption that the determination was correct. *Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir.2011); see § 2254(e) (1).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts

applied Supreme Court holdings. *Hawkins v. Alabama,* 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also Carey v. Musladin,* 549 U.S. 70, 74-77 (2006) (§ 2254 refers to holdings, rather than *dicta,* of the Supreme Court, collecting circuit cases "[r]eflecting the lack of guidance from this Court," on the issue).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Williams v. Taylor,* 529 U.S. 362, 404-406 (2000); *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citing *Williams* ). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 412-13. "Avoiding these pitfalls [described in *Williams v. Taylor* ] does not require citation of our cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8  (2002) (emphasis in original). Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." *Holland v. Jackson,* 542 U.S. 649, 652  (2004).

In *Gill v. Mecusker*, 633 F.3d 1272 (11th Cir. 2011), the Eleventh Circuit clarified how the federal habeas court should address the "unreasonable application of law" and the "unreasonable determination of facts" tests. The court acknowledged the well-settled principle that summary affirmances, such as the Florida First District Court of Appeal's in this case, are presumed adjudicated on the merits and warrant deference. *Id*. at 1288 (citing *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 784–85 (2011), and *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir.2002)). "A judicial decision and a judicial opinion are not the same thing," and the Supreme Court has confirmed that determining whether the state court unreasonably applied the law or unreasonably determined the facts requires only a decision, not an opinion. *Id*. at 1291 (citing *Harrington*, 131 S.Ct. at 784). Yet, the Supreme Court has never squarely addressed whether under the "unreasonable application" test a federal habeas court "looks exclusively to the objective reasonableness of the state court's ultimate conclusion or must also consider the method by which the state court arrives at its conclusion." *Id*. at 1289 (quoting *Neal v. Puckett*, 286 F.3d 230, 244–45 (5th Cir.2002) (summarizing the emerging circuit split)). The Eleventh Circuit concluded that district courts must apply the plain language of § 2254(d) and answer the "precise question" raised in a claim based on the state court's ultimate legal conclusion, and should not "evaluate or rely upon the correctness of the state court's process of reasoning." *Id*. at 1291. In short, the court stated, "the statutory language focuses on the result, not on the reasoning that led to the result." *Id*.

In light of *Gill*, the "unreasonable determination of facts" standard plays a limited role in habeas review because the district court considers the reasonableness of the

trial court's fact finding only to the extent that the state court's ultimate conclusion relied

on it. *Id*. at 1292. A federal habeas court can consider the full record before it to answer

"the only question that matters[:]" whether the state court's decision was objectively

unreasonable.  *Gill*, 133 F.3d at 1290.

Because the Petition alleges ineffective assistance of counsel, a review of the

applicable law is necessary.  Under *Strickland v. Washington*, 466 U.S. 668, 677-78

(1984), to prevail on a constitutional claim of ineffective assistance of counsel, a

defendant must demonstrate (1) that his counsel's performance was below an objective

and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.

*Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to

carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.

To show counsel's performance was unreasonable, a defendant must establish

that "no competent counsel would have taken the action that his counsel did take."

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "The

relevant question is not whether counsel's choices were strategic, but whether they

were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no

"absolute rules" for determining whether counsel's actions were indeed reasonable, as

"[a]bsolute rules would interfere with counsel's independence–which is also

constitutionally protected–and would restrict the wide latitude counsel have in making

tactical decisions."  *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).  "To uphold

a lawyer's strategy, [the Court] need not attempt to divine the lawyer's mental

processes underlying the strategy."  *Chandler v. United States*, 218 F.3d 1305, 1314

n.16 (11th Cir. 2000) (en banc).  "No lawyer can be expected to have considered all of

the ways [to provide effective assistance]." *Id*.

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*.

When, as here, the state courts have denied an ineffective assistance of counsel claim on the merits, the standard a petitioner must meet to obtain federal habeas relief is a difficult one. *Harrington* 131 S.Ct. at 786. The standard is not whether an error was committed, but whether the state court decision is contrary to or an unreasonable application of federal law that has been clearly established by decisions of the Supreme Court. 28 U.S.C. § 2254(d)(1). As the Supreme Court explained, error alone is not enough, because "[f]or purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington*, 131 S.Ct. at 785 (quotation marks omitted). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 786.

When faced with an ineffective assistance of counsel claim that was denied on

the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. So long as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. *Id*. Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. *Id*.

Even without the deference due under § 2254, the *Strickland* standard for judging the performance of counsel "is a most deferential one." *Id.* at 788. When combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*. Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.

## Discussion

### Claim 1: Counsel's failure to follow up on his request for a mistrial regarding the impact on potential jurors of a prejudicial t-shirt worn by a family member of the victim

Prior to voir dire, defense counsel Dennis Boothe filed a motion to prevent the victim's family members from wearing t-shirts at trial that commemorated the victim's memory. The t-shirts had been mentioned in an article in the local newspaper. The

motion was discussed at a hearing, and the State consented to the motion. Defense counsel stated that the motion might be moot in view of the fact that he had not seen anyone wearing the shirts, but he requested that the motion remain in the court file. Exh. G.

Subsequently, and before voir dire began, Boothe advised the court that a family member had been seen wearing one of the t-shirts, and counsel moved for a mistrial. The court's bailiff confirmed that one family member was wearing the shirt, but she left the courthouse when the bailiff asked her to. The woman was not calling attention to herself, and the bailiff did not notice any potential jurors reacting to the shirt. At Boothe's request, Petitioner's sister testified that she saw the woman wearing the shirt and that jurors stared at it when they were sent out for a bathroom break. Noting that voir dire had not yet begun, the court denied the motion with leave for counsel to raise the issue during voir dire. During voir dire, the jurors were questioned by both counsel about sympathy for the victim's family, exposure to pretrial publicity, and other matters bearing on potential juror bias, but no specific questions were asked regarding the woman wearing the t-shirt and no juror mentioned seeing the shirt. Exh. H. Following the trial, counsel raised the issue again in a written motion for new trial. The court denied the motion at sentencing. Exh. O.

Petitioner contends that counsel performed ineffectively by not following up on the mistrial motion and/or specifically questioning jurors about the t-shirt. Petitioner contends that if counsel established that jurors did, in fact, see the t-shirt, then the judge would have granted the mistrial motion. Doc. 2. In rejecting this claim on postconviction review without an evidentiary hearing, the state court reviewed all of the

foregoing proceedings and found that the record of counsel's efforts regarding the shirt demonstrated that counsel dealt with the matter effectively.  Exh. Z.

Petitioner has not shown that the state court's rejection of this claim without an evidentiary hearing was unreasonable.  The trial court record reflects that after counsel moved for a mistrial, the court heard testimony from the bailiff that the woman wearing the t-shirt was asked to leave as soon as the bailiff was made aware of the shirt, and thus the record supports a conclusion that any exposure to the shirt was limited.  The jurors were questioned extensively during voir dire regarding matters bearing on potential bias and exposure to pretrial publicity.  Exh. H.  Defense counsel Boothe requested voir dire of one potential juror in chambers because there was an allegation that the juror had been talking with the victim's family or the victim advocate during the proceedings.  Exh. H at 229-32.  In view of the evidence before the court that any exposure to the t-shirt was necessarily limited due to the bailiff's action, it was not objectively unreasonable for counsel to focus voir dire on other issues bearing on juror fairness.  Petitioner conclusionally alleges that if counsel had established that a juror saw the shirt then the trial court "would have" granted the mistrial motion, but such conclusional and speculative allegations are insufficient to warrant habeas relief.

On this record, there is at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 131 S.Ct. at 785.  Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

**Claim 2: Counsel's failure to move to suppress the audiotape on chain-of-custody grounds**

Julian Williams and his attorney, Roy Lake, contacted law enforcement during the murder investigation and offered Williams' cooperation. Subsequently, Williams recorded conversations with Petitioner. The first conversation took place by cell phone in Lake's truck. Williams set up a face-to-face meeting with Petitioner at Williams' brother's house in Jackson County. Williams was given a tape recorder by investigators, and drove with Lake to the house. The officers rode in two other cars. The tape recorder was placed in the living room, and Lake hid behind a bedroom door armed with a handgun. Officers were positioned in a vehicle where they could observe who came and left the house. Other officers were further away at a convenience store. Williams and Petitioner engaged in a conversation in which Petitioner implicated himself in the murder, and the conversation was overheard by Lake. Lake provided the tape recording to the officers following the conversation. Exh. D.

Boothe moved to suppress the audiotape of the conversation between Petitioner and Williams on two grounds: (1) the officers were outside of their jurisdiction when they were in Jackson County where the conversation occurred; and (2) the recording was not made under the direction of law enforcement. *Id*. At the suppression hearing, the court inquired as to whether Lake would be able to testify about the conversation even if the tape was suppressed, and Boothe responded that he believed he could. The court denied the motion. Exh. E.

Williams and Lake both testified as State's witnesses. Lake testified that he overheard the conversation and that he listened to the tape and found it to accurately

reflected the conversation. Lake also reviewed a transcript of the tape. Over defense

counsel's objection, the tape was admitted into evidence and played for the jury. The

jury was provided with a copy of the transcript but was admonished by the court that the

transcript was a court document to be used as an aid and was not itself evidence.

Petitioner argues that counsel performed ineffectively by not moving to suppress

the tape on chain-of-custody grounds, in addition to the grounds that counsel did

assert. Petitioner contends that the chain-of-custody was unreliable because there

was inconsistent testimony about who provided the tape to Williams, where the device

was located during taping, and who possessed it during the unmonitored recording,

which "raised the suspicion of tampering." Doc. 2.

In rejecting this claim on postconviction review, the state court reasoned as

follows:

> The defendant's first allegation as to ineffective assistance of counsel
> deals with a chain of custody argument concerning the tape recording of a
> conversation between Julian Williams and himself. The record in this case
> demonstrates conclusively that there was no basis to file a legal challenge
> to the admission of the tape on a chain of custody argument. The
> testimony of Roy Lake, attached hereto as *Exhibit A*, clearly indicates that
> the tape recording was taken into custody by him shortly after the
> recording was made, at the location where the recording was made and
> immediately given by him to law enforcement. Mr. Lake then related to
> the officers what he had heard of the conversation from his concealed
> location outside of the house. The officers then played the tape in Mr.
> Lake's presence and he testified in court that the tape contained an
> accurate recording of the conversations he had overheard between the
> defendant and Mr. Williams. Since no factual basis existed for the filing of
> a motion to suppress this tape, the failure of trial counsel to file such a
> motion is not ineffective assistance of counsel. See *Johnson v. State*, 921
> So. 2d 490 (Fla. 2005).

Exh. Z.

Petitioner conclusionally alleges that "inconsistencies" in the testimony raise a

"suspicion of tampering" that would have required suppression of the audiotape. Doc. 2. In assessing the evidence regarding the production of the tape, the state court concluded otherwise. The state court's findings of fact on this point are afforded a presumption of correctness, and Petitioner advances no clear and convincing evidence that the state court's factual determination was "objectively unreasonable," as is necessary to rebut the presumption. *Gill*, 633 F.3d at 1287; see § 2254(e) (1).

Based on its factual findings, the state court concluded that there was no basis for counsel to seek suppression of the tape on chain-of-custody grounds, and therefore that counsel was not ineffective for failing to file such a motion. On this record, there is at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S.Ct. at 785. Petitioner has not established that the state court's rejection of this claim provides any basis for federal habeas relief.

### Claim 3: Ineffective assistance regarding in camera review of tape

The trial record reflects that prior to admission of the tape into evidence Tammy Broxton, a Sheriff's office employee, testified as to how the transcript was prepared. Broxton testified that she "could hear just about everything that was said pretty good" on the tape, and that the transcript was as fair and accurate as she could make it. Out of the presence of the jury, the parties agreed that under state law the transcript could be used by the jury as an aid in understanding provided that it was not taken into the jury room and did not become a focal point of inquiry. Boothe argued, however, that the tape itself was "unintelligible," and therefore that the transcript would become the focal point of the inquiry. Boothe questioned the accuracy of the transcript. The court stated "I need to listen to the tape and compare it to the transcript and see if I agree

that it's either unintelligible or crystal clear, as Ms. Broxton seems to say it is." The court proposed to listen to the tape and review the transcript in chambers during the lunch break, and the parties agreed. Exh. I at 374-94.

Following the lunch break, Roy Lake testified regarding the events surrounding the tape recording. Lake testified that he heard all of the exchange between Petitioner and Williams. Lake testified that the tape recording accurately represented the conversation between Petitioner and Williams, as did the transcript. The court then conducted a sidebar conference with counsel to discuss admissibility of the tape and use of the transcript. The court observed "[t]he tape certainly was authenticated; I think they have authenticated the transcript." The court noted that the tape was difficult to hear when played on a hand-held recorder, but that the court "was able to quite clearly hear the conversation" when the tape was played on Dictaphone equipment. The court noted some typographical errors in the transcript that were not significant. The court overruled Boothe's objections and ruled that the jury would be permitted to have a copy of the transcript, with a limiting instruction as to its use. The prosecutor agreed that the logistics of playing the tape in the courtroom would be tested prior to publishing the tape to the jury. Exh. I at 395-418.

Lake testified regarding the taping and Petitioner's statements to Williams. Lake testified that while Petitioner did not come right out and say "I killed her," the conversation was that Williams was not to blame for the murder, with Petitioner stating "[d]on't worry about it, Dog. I won't let 'em get you, Dog. I won't tell on you, Dog." *Id.* at 428. At the conclusion of Lake's cross-examination, court was recessed for almost 30 minutes to set up the sound equipment. Exh. I at 431. When court resumed, the

tape was moved into evidence and the transcript was provided to the jury.  The court

instructed the jury that the transcript was an aid to understanding the tape, but the tape

itself was the evidence.  *Id*. at 432.  After the tape was played, the transcripts were

picked up by the bailiff.  *Id.* at 440.  Out of the presence of the jury, Boothe argued that

the jurors had relied on the transcript rather than listening to the tape.  The court

expressed concern that some jurors were not turning the transcript pages in unison,

suggesting they were not following along with the audiotape.  The court found the tape

as played in court to be of poor quality and difficult to understand.  *Id*. at 442.

Petitioner contends that his trial counsel rendered ineffective assistance by

failing to protect Petitioner's right to be present at a critical stage of the proceeding

because the trial court listened to the audiotape *in camera* during a lunch break to

assess its admissibility and the extent to which the jury would be allowed to use the

transcript as an aid.  Petitioner contends that the device used by the judge to listen to

the tape *in camera* was different than the device used to publish the tape to the jury,

which was "dramatically different in quality."  Petitioner argues that if had been present

during the *in camera* review, the "deficient nature of the tape and sound system would

have been immediately apparent and another ground for suppression of the tape would

have arisen."  Petitioner conclusionally alleges that "[w]ithout the tape and the

transcript, the State would not have been able to prove guilt beyond a reasonable

doubt[.]"  Doc. 2.

In rejecting this claim on postconviction review, the state court stated:

The defendant's second allegation of ineffective assistance of counsel
arises from his contention that trial counsel should have arranged for the
defendant to be present when the trial judge listened to a tape recorded

conversation of the defendant and compared it with a transcript of the tape prepared by the State. This review by the trial judge was conducted in-camera during a lunch break and consisted of the trial judge listening to the tape on two recorders; one was a hand held unit which did not provide a clear understanding of the tape; the second was dictaphone equipment which provided a clear understanding of the tape. The trial judge also found some typographical errors in the submitted transcript but none that were significant, see *Exhibit B*. The Court finds that the in-camera examination of the tape conducted by the trial judge was not a critical stage of the proceedings and thus the defendant did not have the absolute right to be present, *United States v. Gallager*, 57 Fed.Appx. 622 (6th Circuit 2003). Additionally, even if defendant or his trial counsel had been present, the comments of the trial judge on pages 415 and 416 clearly demonstrate that their presence would not have changed the procedure used by the trial judge or his determination of the tape's clarity. This Court therefore denies this allegation of ineffective assistance of counsel.

Exh. Z.

Petitioner points to no clearly established Federal law that is contrary to the state court's conclusion that the *in camera* review of the tape in this case was not a critical stage of the proceeding. *See* Doc. 2. *See* § 2254(d)(1). The Due Process Clause guarantees a defendant the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975). Such critical stages include: steps that hold "significant consequences for the accused," *Bell v. Cone*, 535 U.S. 685, 695-96 (2002); where "[a]vailable defenses may be irretrievably lost, if not then and there asserted," *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961); where "rights are preserved or lost," *White v. Maryland*, 373 U.S. 59, 60 (1963); when counsel's presence is "necessary to mount a meaningful defense," *United States v. Wade*, 388 U.S. 218, 225 (1967); and where "potential substantial prejudice to defendant's rights inheres in the ... confrontation and [where] counsel [can] help avoid that prejudice," *Coleman v. Alabama*, 399 U.S. 1, 9

(1970).

In this case, the record establishes that both the tape and the transcript were disclosed to the defense during discovery. Exh. I at 379. Boothe moved to suppress the tape prior to trial, and vigorously advocated against admission of the tape and use of the transcript during the trial. The court undertook *in camera* review of the evidence only after hearing counsel's objections, and with the consent of the parties. The record reflects no new or different evidence presented or improper *ex parte* communication during the court's lunch break. Following the court's *in camera* review, Boothe undertook further efforts during a sidebar conference to argue that the tape was "unintelligible to the average person" and advocate against use of the transcript by the jury. *Id.* at 414. Counsel reasserted his arguments after the tape was played. Under these circumstances, and in view of Supreme Court precedent outlining what amounts to a "critical stage," the state court's determination that the *in camera* review was not a critical stage is not contrary to, or an unreasonable application of, Federal law. Counsel availed himself of multiple opportunities to challenge the evidence before and after its admission. On this record, there is at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard," even though counsel did not request Petitioner's presence at the *in camera* review. *See Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 4: Ineffective assistance during cross-examination of Lake

The trial record reflects that Boothe's cross-examination of Lake focused on the benefits that Williams gained by cooperating in the murder investigation, including being

released following his arrest.  Boothe also suggested in his cross-examination that law enforcement was under pressure to solve the murder case quickly and was eager to accept Williams' story.  Exh. I at 418-31.

Petitioner contends that Boothe was ineffective in cross-examining Lake because he did not elicit testimony regarding Lake's bias or motive to testify falsely on behalf of Williams.  In particular, Petitioner contends that Lake should have been questioned as to why Lake would put himself in harm's way by arming himself and secreting himself inside the home where the taping occurred.  Petitioner contends that in view of the theory of the defense – that Williams murdered Laster – counsel failed to explore cross-examination regarding Lake's alleged participation in the planning and execution of Williams' attempt to frame Petitioner.  Docs. 1, 2.

The trial court summarily rejected this claim:

> The defendant's third allegation of ineffective assistance of counsel deals with trial counsel's cross-examination of witness, Roy Lake. Defendant argues that trial counsel should have gone into more areas of possible bias or motive to falsely testify by Mr. Lake on behalf of his client, Julian Williams. The trial transcript attached as *Exhibit C* indicates that trial counsel effectively cross-examined Mr. Lake concerning the relevant issues in the case. This Court finds that the performance of trial counsel in this matter did not fall below that of the standard expected of competent trial counsel under *[Strickland]*. This court therefore denies this allegation of ineffective assistance of counsel.

Exh. Z.

An attorney's decision regarding the scope of cross-examination is "a tactical one well within the discretion of a defense attorney," and absent a showing that counsel's cross examination would have affected the outcome of the trial, there is no prejudice under *Strickland*.  *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001).  Indeed,

counsel's cross examination and trial strategies are presumed reasonable. Petitioner's assertion that Lake facilitated a scheme by Williams to frame Petitioner is wholly unsupported and conclusional. Petitioner proffers no factual support demonstrating that counsel's cross-examination of Lake fell below acceptable standards of reasonableness or that he was prejudiced by any claimed deficiencies in his cross-examination.

On this record, there is at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard," with respect to his strategy in cross-examining Lake. *Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 5: Counsel's failure to request a non-death qualified jury

Petitioner contends that counsel was ineffective for not requesting a non-death qualified jury. In support of this claim, Petitioner relies on *United States v. Green*, 343 F.Supp. 23, 33 (D. Mass. 2004) for the proposition that "studies suggest that death qualification leads to the exclusion of a disproportionate number of black and female jurors" and "similar studies raise the serious concern that death-qualified juries are more conviction prone." In *Green*, a federal capital case, the district court ordered two jury panels, a non-death qualified one for the guilt phase and a death-qualified one for the penalty phase. Petitioner contends that counsel was ineffective for failing to request two jury panels in his case. Doc. 2.

The state court summarily rejected this claim:

The defendant's fifteenth claim of ineffective assistance of counsel is that trial counsel should have requested a non-death qualified jury. At the beginning of the trial the State was planning to seek the death penalty in

the event of a first degree murder conviction. Prior to the beginning of the death penalty phase the State announced that it had decided to not seek the death penalty. As a condition of the State not seeking the death penalty, the defendant waived his right to "any subjective appellate issue regarding death qualification of the jury," *see Exhibit O*. The defendant acknowledged on the record his concurrence with this arrangement and his understanding of it. Given the defendant's announcement on the record of his concurrence with this strategy, he waived any right he had to raise this issue. The Court therefore finds that trial counsel was not ineffective in this regard.

Exh. Z.

As the Respondent points out, the record reflects that Petitioner personally waived any challenge regarding the death qualification of the jury. Moreover, Petitioner has failed to show that counsel performed ineffectively in this regard because any motion for two jury panels would have been directly contrary to state law. Fla. Stat. § 921.141(1) provides that the separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment "shall be conducted by the trial judge *before the trial jury* as soon as practicable." (emphasis added); *see Riley v. State*, 366 So.2d 19 (Fla. 1978). There is no basis under state law for counsel to have requested two jury panels. The federal district court procedure ordered in *Green* was subsequently vacated by the First Circuit for being inconsistent with the Federal Death Penalty Act. *See United States v. Green*, 407 F.3d 434 (1st Cir. 2005).

On this record, there is at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard," with respect to counsel's failure to request a non-death qualified jury for his trial. *See Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### *Claim 6: Counsel's performance regarding race-based strikes*

Petitioner asserts that Boothe was ineffective for failing to object to race-based strikes of jurors.  Petitioner contends that Boothe should have requested a race-neutral reason for every strike involving an African-American juror, instead of waiting until the fifth and last African-American juror, Ms. Brown, was struck, at which point counsel asserted a *Batson* objection.  Doc. 2.

The state court summarily rejected this claim as follows:

Defendant's eleventh ground alleging ineffective assistance of counsel is that trial counsel was tardy in interposing an objection to African-American jurors being stricken by the State. The trial record does demonstrate that trial counsel raised proper challenges to the striking of juror Brown, see *Exhibit M*. At that time the prosecutor placed his reasons for using the strike on the record and the trial judge determined that the reasons given were race neutral. Additionally, the other African-American jurors named by defense counsel who had been stricken by the State were either stricken for race-neutral reasons or for cause by the Court, see *Exhibit N*. Regardless of when the objection was raised by defense counsel at trial, the attached portions of the trial transcript clearly demonstrate that race-neutral reasons were given by the State in the exercise of its peremptory challenges. The Court therefore finds as to this allegation that even if trial counsel should have earlier requested reasons for the State's use of peremptory challenges on African-American jurors, the race neutral reasons given by the State clearly demonstrate that the defendant suffered no prejudice as a result thereof.

Exh. Z.

The Supreme Court has explained that:

Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful discrimination. . . .The second step of this process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a

discriminatory intent is inherent in the prosecutor's explanation, the
reason offered will be deemed race neutral.

*Purkett v. Elem*, 514 U.S. 765, 767-68 (internal quotations and citations omitted).

In this case, the trial record reflects that the prosecutor requested that the first

African-American juror, Ms. Jenkins, be stricken for cause because she had been a

close friend of Petitioner's family for 25 years.  The court denied the cause challenge,

and the State exercised a peremptory strike.  Exh. H, 452-53.  The State exercised a

peremptory strike to remove the second African-American juror, Mr. Sheffield.  *Id*. at

453.  The State attempted to strike a third African-American juror, Ms. Rhyne, for cause

because she was acquainted with Petitioner's family.  The court denied the cause

challenge, and the State exercised a peremptory strike.  A fourth African-American

juror, Mr. Potter, was stricken for cause because of contact with a witness and his

statement that he would require the State to present a "perfect case."  *Id*. at 592-93.

Upon the peremptory strike of the fifth African-American juror, Ms. Brown,

counsel objected and requested a race-neutral reason for the challenge.  Counsel

argued "[t]he State has struck Ms. Brown, who is an African-American; Ms. Rhynes,

who's another African-American; Mr. Potter, who happens to be African-American . . .

So I would ask for a non-racial ground, pursuant to the *Neal* [sic] rule."  *Id*. at 593-94.

The prosecutor proffered that Brown was the cousin of a defendant who had been

prosecuted for second degree murder by the same prosecutor.  Further, during voir dire

Brown expressed that she might have trouble crediting testimony from people who had

been charged with crimes and she expressed disappointment with the outcome of a

previous case in which she was a victim.  *Id*. at 594.  The court accepted these reasons

as race-neutral and overruled Boothe's objection. *Id*. at 595.

In rejecting this ineffective-assistance claim on postconviction review, the state court observed that even if counsel arguably should have requested a race-neutral reason for each peremptory strike, the other African-American jurors named by defense counsel who had been stricken by the State were either stricken for race-neutral reasons or for cause by the Court. The record supports this conclusion as to the jurors named in Boothe's objection: Jurors Jenkins, Rhyne, Potter, and Brown. *See* Exh. H at 452-595.

Although the record supports a conclusion that Boothe asserted a claim that the State was engaging in a pattern of discriminatory strikes, Boothe did not interpose a specific *Batson* objection to the peremptory strike of the second African-American juror, Mr. Sheffield, and did not name Mr. Sheffield specifically when asserting his claim. Even if counsel arguably erred in this regard, Petitioner has not established prejudice. To establish prejudice for counsel's failure to assert a *Batson* challenge to the peremptory strike, Petitioner must show that, had counsel objected, his challenge would have been successful and the inclusion of the juror on his jury would have carried a reasonable probability of changing the outcome of the trial. *Sneed v. Fla. Dept. of Corr.* 496 Fed.Appx. 20, 26, 2012 WL 5417103, 5 (11th Cir. 2012) (unpublished) *(*citing *Marquard v. Sec'y Dep't of Corr.*, 429 F.3d 1278, 1305 (11th Cir. 2005) (Petitioner has the burden to show more than that the error had "some conceivable effect on the outcome of the proceeding. . . . "Rather, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.").[2]

In this case, the jury's verdict was amply supported by the evidence, including testimony by witnesses who helped Petitioner conceal and move the victim's body. Further, as the Eleventh Circuit has concluded regarding a similar claim in a case involving a black defendant and a black victim, "the crime in this case did not have any particular racial dimensions, which would cast doubt upon a verdict returned by a racially unbalanced, unconstitutionally composed jury. . . Nothing in the record indicates that a racially balanced jury would have been more likely to acquit or convict of a lesser charge than was the all-white jury in this case." *Jackson v. Herring,* 42 F.3d 1350, 1362 (11th Cir. 1995).

In light of the foregoing, the state court's rejection of this claim on the prejudice prong of *Strickland* is not objectively unreasonable. *See Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 7: Ineffective assistance regarding uncalled witness Loria Ridley

Petitioner contends that his trial counsel was ineffective for failing to call Loria Ridley as a defense witness. Petitioner asserts that Ridley would have testified that while she was in a relationship with Williams he threatened to kill her by strangling her, the same method by which Laster was killed. He asserts that he expected Ridley to testify and Boothe did not obtain his consent not to call her. Docs. 1, 2.

Both Petitioner and Boothe testified at the postconviction evidentiary hearing on

---

[2]Although unpublished opinions are not binding on this Court, they are persuasive authority. 11th Cir. R. 36-2.

this claim.  Following the evidentiary hearing, the state court held as follows:

> A review of Ms. Ridley's testimony indicates that her encounter with Mr. Williams was one that arose from an argument the two of them were having over their child; it did not involve a belt or any other object being placed around her neck; nor was there any sexual activity involved in the incident. At the evidentiary hearing on this matter, trial counsel, Dennis Boothe, Esq., testified that he felt the incidents were too dissimilar that any advantage gained from presenting such testimony to the jury would be greatly outweighed by the loss of the rebuttal closing argument that would result in [sic] him presenting any testimony other than the defendant's (that being the rule applicable to closing arguments at the time of this trial).  After considering the testimony of Mr. Boothe, this Court determines that his decision to not call Ms. Ridley to testify was one based on sound trial strategy and did not constitute ineffective assistance of counsel. Further this Court finds that the testimony was so dissimilar from that involved in the death of the victim that it is highly questionable wither the testimony would have even been admissible. (citations omitted).

Exh. CC.  The court specifically credited Boothe's testimony that he would have called Ridley to testify "in spite of his own misgivings" if Petitioner had insisted, finding it "persuasive that he was not faced with such an insistence by the defendant."  *Id*.

In the habeas corpus context, "[c]omplaints concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative."  *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980).   Further, the state court's findings as to witness credibility are presumptively correct.  *See Brown v. Head*, 272 F.3d 1308, 1314 (11th Cir. 2001).

In view of the heavy showing necessary to succeed on a claim that counsel performed deficiently with respect to an uncalled witness, and the deference that must be afforded to counsel's strategic decisions, on this record the Court concludes that Plaintiff has failed to establish that the state court unreasonably concluded that Boothe

did not perform deficiently. Counsel expressed a reasonable strategy regarding this witness, which the state court accepted. The state court specifically credited Boothe's testimony over Petitioner's regarding whether Petitioner instructed Boothe to call Ridley. There is at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard," with respect to his trial strategy. *See Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 8: Counsel's failure to move to disqualify the trial judge

The trial judge in Petitioner's case, Judge Cole, was the brother-in-law of Roy Lake. Petitioner contends that his trial counsel performed deficiently by failing to discover the relationship between Judge Cole and Lake, which was "common knowledge in the community." Petitioner argues that prejudice is presumed under these circumstances because Judge Cole's relationship to Lake reflects a "structural defect" in the proceeding. Docs. 1, 2.

Following the evidentiary hearing, the state court rejected this ineffective-assistance claim as follows:

> At the evidentiary hearing the State conceded that Judge Cole and Mr. Lake were married to sisters at the time of trial. Mr. Boothe testified that he had no knowledge of this fact at the time of the trial and that if he had known of this he would certainly have investigated the relationship but could not say that the relationship in and of itself would have caused him to file a motion for recusal. Additionally Mr. Boothe testified that he saw nothing during the proceedings that indicated that Mr. Lake was receiving any preferential treatment from Judge Cole. Judge Cole testified at the evidentiary hearing that he and Mr. Lake never discussed cases outside of court during the time they were brothers-in-law. While counsel was given the opportunity to present to this Court any case

law that supported a per-se reversible argument when such a relationship exists between the presiding judge and an attorney representing a party to an action, none has been provided and this Court does not feel that such a rule is appropriate. Additionally, given the particular facts of this case no prejudice to the defendant can be shown as to this issue such that "confidence in the outcome of [the] proceeding has been undermined by counsel's deficiency [in failing to file a motion to recuse the trial judge]." A careful review of the trial record and the testimony presented at the evidentiary hearing in this matter shows that the only evidentiary ruling made by Judge Cole concerning Mr. Lake's testimony was the ruling concerning the transcript of the surreptitiously recorded conversation between Mr. Lake's client and the defendant. The transcript of the trial proceedings shows that Judge Cole carefully considered the testimony of Mr. Lake as to the accuracy of the transcript and that during the lunch break he compared the transcript to the actual recording using two types of equipment. Judge Cole's careful consideration of this issue demonstrates his professional and unbiased approach to the issues concerning Mr. Lake. Additionally, in support of the accuracy of the tape and the transcript, Julian Williams testified that he had listened to the tape recorded conversation he had with the defendant and had reviewed the transcript of that conversation and found it to be accurate. This Court therefore finds that under the circumstances of this particular case failure to file a Motion to Recuse does not represent ineffective assistance of counsel.

Exh. CC.

Petitioner points to no clearly established Federal law that is contrary to the state court's conclusion that Petitioner was required to make a showing of prejudice in order to succeed on this claim.  *See* Doc. 2.  *See* § 2254(d)(1).  The one federal case cited by Petitioner for the proposition that recusal was required is *McCuin v. Texas Power & Light Co.,* 714 F.2d 1255 (5th Cir. 1983), in which the Court held that disqualification was required where the judge was the brother-in-law of an attorney representing a *party* in the case.  The cited case did not concern an ineffective-assistance claim, and in the

instant case the judge was related to a witness, not a party.

In this case, counsel testified that he was unaware of the relationship between Judge Cole and Lake, and "absent some evidence that recusal was warranted," Petitioner has failed to show that counsel performed deficiently by not filing a recusal motion. *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998). Further, in the context of an ineffective-assistance claim, Petitioner must establish that he "was prejudiced by the absence of a recusal motion." *Baldwin*, 152 F.3d at 1317. The state court carefully reviewed the record regarding Lake's participation in the trial and Judge Cole's rulings, and found no evidence of prejudice to Petitioner. There is thus at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard." *See Harrington*, 131 S.Ct. at 785. Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 9: Failure to obtain videotape in Williams' possession

Petitioner contends that his counsel was ineffective for failing to obtain a videotape that Williams allegedly possessed which showed Williams engaging in "rough sex" with the victim. Petitioner contends that the videotape could have inculpated Williams as the killer, and that counsel should have pursued contempt sanctions against Williams for failing to produce the videotape. Docs. 1, 2.

At trial, Williams testified that he had videotaped himself and the victim having sex, but denied that the tape depicted "rough sex," denied that he could find the tape, and denied that Petitioner had ever seen the tape. Exh. I, 630-33. At the evidentiary hearing on Petitioner's postconviction motion, the prosecutor testified that the State had been unable to locate the videotape. Boothe testified that he "did everything humanly

possible" to obtain the videotape, with no success. Boothe had Petitioner testify at trial

about rough sex on the tape, allowing Boothe to argue that Williams was hiding the

tape because it was incriminating. Boothe noted that the tape could have shown that

the sex acts were consistent with Williams' story, so his chosen strategy worked without

the chance that the tape could have contradicted it. Exh. BB, 233-34. Boothe testified

that he doubted whether having Williams jailed for contempt would have been an

effective strategy if no one had been able to locate the tape. Exh. B at 237.

> In rejecting this postconviction claim, the state court explained:

> The testimony at the evidentiary hearing . . . is convincing to this Court
> that trial counsel made reasonable efforts in his attempts to secure the
> elusive videotape . . . . Mr. Boothe testified that he had a subpoena duces
> tecum issued to Mr. Williams for the production of the tape but that Mr.
> Williams testified that he was unable to find the tape. Defendant's current
> argument that Mr. Boothe should have followed up on this by asking the
> trial judge to incarcerate Mr. Williams for his failure to produce the tape
> overlooks the fact that the trial judge could not have incarcerated Mr.
> Williams for his failure to produce the tape unless he found that his failure
> to do so was willful. Given Mr. Williams testimony that he could not find
> the tape, even if Mr. Boothe had sought a contempt proceeding he would
> have been unsuccessful. Additionally, the Assistant State Attorney who
> was handling the prosecution of this case testified that he too was unable
> to get the tape. Finally, the testimony of Mr. Williams and the defendant
> differed greatly as to what the tape would show if found. The defendant
> alleged that the tape would show rough sex; Mr. Williams testified that the
> tape would show normal, consensual sex. While this Court finds that Mr.
> Boothe's efforts in locating the tape to have been all that could have been
> expected, the failure of Mr. Williams to produce the tape also allowed Mr.
> Boothe to argue that he had intentionally destroyed or misplaced the tape
> in order to protect himself. The totality of Mr. Boothe's professional
> performances in this matter clearly do not fall below the level of
> professionalism expected of effective trial counsel.

Exh. CC.

> The state court plainly credited Boothe's testimony regarding his efforts to

procure the tape and his strategic decision to use the absence of the tape to

Petitioner's advantage. The record establishes at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard," with respect to his examination of Williams and his treatment of the alleged videotape. *See Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 10: Counsel's failure to fully investigate the Walls Junior Store robbery

As part of the State's theory of the case, the State posited that Petitioner killed the victim because she threatened to expose his involvement in a robbery of Walls Junior Store. Petitioner contends that trial counsel was ineffective for failing to investigate and present evidence demonstrating that Petitioner was not involved in the robbery. In particular, Petitioner claims that counsel was ineffective for failing to have hair in a stocking cap found at the scene of the robbery subjected to DNA testing. Docs. 1, 2. Petitioner subsequently sought DNA testing of the hair in September 2011, but the outcome of such testing is not reflected in the record. Doc. 36-1.

At the evidentiary hearing, Boothe related his efforts to investigate the robbery. Boothe took witness statements, including a statement from a woman who allegedly confessed to the robbery. Boothe also took the deposition of the case investigator. He testified that he did not have the cap tested for DNA because he felt that the State could not meet its burden of proving that Petitioner was the robber. Exh. BB at 238-39. Although Boothe would have attempted to have the hair tested if Petitioner had insisted, Boothe indicated that he was "not in the business of creating evidence against my client," as the cap could have come back with Petitioner's DNA on it. Exh. BB at 240-42.

In rejecting this claim following the evidentiary hearing, the state court held:

A review of the trial record and the evidentiary hearing testimony is convincing that Mr. Boothe handled this matter in a professional and competent manner that comports with the "reasonable effective counsel standard of [Strickland]. Initially, the Court notes that Mr. Boothe's cross examination of Chipley Police Officer Kevin Crews, who investigated the robbery, brought to the jury's attention the following facts: 1) the robbery victim stated that the robber was wearing a baseball cap, not a stocking cap such as the one in which the hair was found; 2) the day after the robbery, Officer Crews was informed by Melinda Brown that she had assisted Jerry Causey in committing the robbery, a statement she later recanted; 3) the victim could not identify Mr. Causey from a photo line-up as being the individual who robbed him; and 4) the victim could not identify the defendant from a photo line-up as being the individual who robbed him. Additionally during his cross examination of Officer Crews Mr. Boothe broguht out the fact that the witness on whom Officer Crews was relying as to the defendant's involvement in the robbery, Monique Brown, did not come forward with her information until some twenty months after the robbery and the information she gave him as to what the defendant allegedly took from the victim was different from what Officer Crews' report on the night of the incident reflected that the victim had told him had been taken. Further, Mr. Boothe did an excellent job in presenting the inconsistencies in the witnesses' stories concerning the defendant's involvement in his closing argument.

In addition to finding the above to clearly demonstrate that the defendant is not entitled to relief on this ground, the Court finds that even if the hair found inside the stocking cap had been resubmitted to the lab with a sample from the defendant and the lab had determined that the hair was not from the defendant, this fact is not reasonably likely to have any impact on the outcome of the trial. Officer Crews testified that the stocking cap, in which the hair was found, was discovered the next day beside a road leading to a trailer park near the robbery scene. However, the night of the robbery Officer Crews discovered in the same trailer park a baseball cap that more nearly matched the description given by the robbery victim. No hair was found in the baseball cap. This Court finds that the defendant is not entitled to the relief he requests in this ground.

Exh. CC.

The state court credited Boothe's testimony regarding his efforts to investigate

the robbery, and pointed to relevant parts of the record showing that counsel utilized the

results of his investigation to undermine the State's theory of Petitioner's motive for the murder. The record establishes at least a "reasonable argument that counsel satisfied *Strickland's* deferential standard," with respect to his investigation of the robbery and his efforts to undermine the State's case regarding motive. *See Harrington*, 131 S.Ct. at 785. Thus, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 11: Denial of postconviction newly-discovered evidence claim

In his postconviction proceedings, Petitioner argued that Juror Margaret Gilmore disobeyed the Court's trial instructions by relying on the transcript of the audiotape as evidence. Petitioner contends that juror misconduct deprived him of his due process right to a fair trial. Docs. 1, 2.

In support of his state postconviction motion, Petitioner presented an affidavit of an investigator alleging that a juror at Petitioner's trial, Margaret Gilmore, told him that she "went by the transcript, not the tape" because the tape was hard to understand. Gilmore testified at the postconviction hearing. Gilmore testified that she had to rely on the transcript to understand the tape, but that she understood the tape was the actual evidence and she followed the court's instructions in that regard. She testified that there was overwhelming evidence of Petitioner's guilt, but the tape was a substantial factor and in her mind there was a "reasonable probability" that without the transcript there would have been reasonable doubt in her mind. Exh. CC at 7-8.

The state court concluded that Gilmore's testimony did not provide a basis for postconviction relief:

The reason a transcript such as the one in this case is offered by a party

is because certain parts of the tape recording are either inaudible or difficult to understand without the assistance of a party who was present when the conversations occurred. This assistance is offered to the jury by use of a transcript properly authenticated by the party who was present at the conversation. The use of a transcript presupposes some difficulty in an independent party being able to fully understand a taped recording without assistance. Obviously, without such assistance, i.e., the properly authenticated transcript, the third party (in this case, juror Gilmore) might have doubts as to the full import of the recorded conversation. With it, the third party can draw their own conclusions as to whether the transcript assists them in evaluating the taped recording. The Court views juror Gilmore's testimony to state nothing more than this; that without the transcript she would have had trouble understanding the taped recording which would have left her with doubts as to Defendant's guilt. With the transcript, however, she was able to form her conclusion, after comparing it with all the other evidence in the case, that the Defendant was guilty as charged. Therefore this Court finds that the testimony at the evidentiary hearing fails to demonstrate that he is entitled to the relief he requests on this ground.

Exh. CC at 8.

Petitioner has not shown that the state court's conclusion is contrary to or an unreasonable application of clearly established federal law. The decision to permit the use of the transcript was plainly a matter of state evidentiary law. Federal habeas courts do not sit to review State evidentiary rulings unless the alleged error is of such a magnitude as to render the state defendant's trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 71 (1991); *Knight v. Singletary*, 50 F.3d 1539, 1546 (11th Cir.1995). Further, as Respondent points out, habeas relief for alleged juror "misconduct" is not warranted unless the misconduct stems from external influences over the jury's deliberation, and not actions that arise during court proceedings. *Sireci v. Attorney General* 406 Fed.Appx. 348, 352 2010 WL 5174519, *4 (11th Cir. 2010). In this case, the juror testified that she understood the purpose of the transcript, and her comment that reasonable doubt may have existed without the transcript is irrelevant in

view of the fact that she did have the transcript and understood its purpose. Under these circumstances, Petitioner has not established that the state court's rejection of this claim provides a basis for federal habeas relief.

### Claim 12: Sufficiency of the evidence

Petitioner contends that his first degree murder conviction was not supported by the evidence because the prosecution failed to prove that he acted with premeditation. Docs. 1, 2. Respondent contends, however, that this claim is unexhausted for purposes of federal habeas corpus review because Petitioner did not raise the claim as a federal constitutional due-process issue in the state court. Although Petitioner challenged the sufficiency of the evidence on direct appeal, he raised the claim only as one of state law. Doc. 30.

Before bringing a habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion. 28 U.S.C. § 2254(b)(1), (c). Exhaustion requires that prisoners give the state courts a "full and fair opportunity" to resolve all federal constitutional claims by "invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To properly exhaust a federal claim, a petitioner must "fairly present" his federal claim in each appropriate state court, thereby affording the state courts a meaningful opportunity to "pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation omitted). Thus, the Court agrees that Petitioner procedurally defaulted his evidence-sufficiency claim by not asserting a federal claim in state court. Petitioner presents no argument that he can show any

cause or prejudice sufficient to overcome the procedural default.

Even if the claim were not procedurally defaulted, it is clear that it is due to be rejected on the merits.[3]  When reviewing a claim of the sufficiency of the evidence on federal habeas review, this Court is required to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "In determining whether the facts of a particular case satisfy the *Jackson* standard, it is necessary to refer to the essential elements of the crimes as defined by state law." *Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir. 1987) (citations omitted).

Under Florida law, "premeditation" is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act about to be committed, and the probable result of that act.  Fla. Stat. § 782.04(1), *Spencer v. State*, 645 So. 2d 377 (Fla. 1994). Premeditation is proved if the jury may reasonably conclude there was a fully formed purpose to kill, with enough time for thought, and that the accused's mind had become conscious of its design. *Powell v. State*, 112 So. 608 (1927).

In this case, the State adduced evidence that the victim and Petitioner had a physical altercation on the night of her murder and that Petitioner had made statements that he wanted to kill Laster.  Exh. I 89-90, 92, 147-148, 150- 153, 495-96, 1362, 1365. There was forensic evidence that death by strangulation would have taken several

---

[3] Pursuant to 28 U.S.C § 2254(b)(2), a habeas petition may be denied on the merits, notwithstanding Petitioner's failure to exhaust state court remedies.

minutes to occur.  Exh. I, 1272.  Evidence of strangulation, in conjunction with one or

more additional facts indicating that the killer had time to reflect upon his actions and to

form a conscious purpose to kill, justifies submitting the question of premeditation to the

jury.  *Balzourt v. State*  75 So.3d 830, 835 (Fla.App. 2 Dist. 2011) *see* Fla. Stat. §

782.04(1); *Spencer*, 645 So. 2d at 381 (premeditation may be shown by evidence of

prior altercation and the manner in which homicide was committed).

On this record, and viewing the evidence in the light most favorable to the

prosecution, it is clear that a rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.  Petitioner has failed to show that

state court's rejection of this claim was contrary to, or an unreasonable application of,

federal law.

## Certificate of Appealability

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a

certificate of appealability when it enters a final order adverse to the applicant," and if a

certificate is issued "the court must state the specific issue or issues that satisfy the

showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be

filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing

Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional

right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

Therefore, the undersigned recommends that the district court deny a certificate of

appealability in its final order.

Rule 11(a) also provides: "Before entering the final order, the court may direct

the parties to submit arguments on whether a certificate should issue." Thus, if there is

an objection to this recommendation by either party, that party may bring this argument

to the attention of the district judge in the objections permitted to this report and

recommendation.

Accordingly, it is respectfully **RECOMMENDED:**

1. That the petition for writ of habeas corpus (Doc. 1) should be **DENIED**.

2. That a certificate of appealability should be **DENIED.**

**IN CHAMBERS**  this 19th day of August 2013.


*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**